Mr. Marzullo. Thank you, Your Honor. The trial court made two key errors of law which require reversal in this case. First, she failed to follow the takings liability rule established by this court in A&E Auto. And second, she failed to follow the economic impact test established by this court most recently in Anaheim Gardens. Turning first to the liability test in A&E Auto, this court announced that where the government offers financial assistance to induce or to require a third party to damage or destroy private property, that a taking may have occurred, depending, of course, on the circumstances. The test that the trial court used here was quite different. She required the plaintiffs, under their burden of proof, to prove that the government forced Chrysler to file its bankruptcy, an almost insurmountable test. Now, the head of the auto team, Stephen Ratner, often referred to as the car czar, testified that dealer termination was a, quote, integral part of the package that we told Chrysler was necessary to obtain financial assistance. He further testified on cross-examination that under the government's plan, under the government's plan is a quote, under the government's plan, some franchisees would remain in business and others would not, under the government's plan. And he also testified that it was the government's determination that, quote, if you want the government's money and you want a chance to restructure, you're going to have to use bankruptcy. Not only do we have that testimony, but of course, we have the contractual requirement, section 7.20 of the bridge loan agreement, which requires that Chrysler submit a so-called viability plan to show how it plans to move forward. And one element of that viability plan, which had to be approved by the president's representative, in this case, Mr. Ratner, the head of the auto team, was a reduction in the dealer network based on the conclusion of the auto team that a reduction in the size of the network would be beneficial and would be required if the government is to put more public money into Chrysler. The viability plan that Chrysler submitted in an attempt to comply with 7.20 was rejected by the government. The government said that viability plan did not meet the requirements of section 7.20 of the bridge loan agreement. And one of the reasons, one of the elements that did not meet the requirements was the fact that Chrysler did not propose terminating dealers. Rather, Chrysler proposed a continuation of the so-called Project Genesis, a voluntary plan of consolidation among dealers so that they would bring all three amortization of dealerships, which was running at about 10% a year, and to also continue the voluntary consolidation of dealerships as it had been doing in prior years. The government rejected that, said it wasn't good enough. The government tries to defend the trial court by citing the Frouhoff standard. Now, that's a standard for determining whether a party entered a contract under duress. This is not a duress case. It's not a contract case. It's most certainly not a tort case. As a matter of fact, a just compensation case under the Fifth Amendment assumed that all of the government's actions were lawful and legal. And as the court has set forward in A&E Auto, that the only question is whether the financial assistance offered induced or required Chrysler, in this case, to take action to terminate the dealer's franchises. Mr. Marzullo, what's the best quote from A&D that says that coercion is automatically present when the financial terms induced or required a specific effect on a third party? I'm not sure, Your Honor, that there's exactly that quote. The court, as you know, grappled with the government's contention that Chrysler acted entirely on its own. And of course, we didn't have the testimony of Mr. Ratner at that time. We didn't have the contract. We didn't have—the court didn't have the benefit of paragraph 7.20. So what the court was talking about was, well, if you're trying to determine whether Chrysler acted entirely on its own, entirely voluntary, and therefore there was no government action. And I think that's the key question. The government claimed it had nothing to do with the termination of these dealings. Right. But it seems to me there's some distance between saying entirely voluntary and that there's a spectrum of activities here, entirely voluntary, a requirement that would induce or an offer of assistance that would require induced action, and coercion. And I guess I'm not quite remembering that we equated in A&D the second and third things, the inducement or requirement on the one hand and coercion. And I guess I take it that the CFC essentially read the decision to require that not every, or to say that not every requirement or inducement would be—would amount to coercion. You still have to ask a question about whether it was sufficiently, I don't know, bad to amount to coercion. I think that's kind of right, Your Honor, if I may, because the other problem with the trial court's formulation of forcing Chrysler to file bankruptcy is that that was not the financial inducement or the financial aid that resulted in the termination of the dealers. Bankruptcy was a step in the process. But what the trial court did was to limit her inquiry then to saying, well, the board of managers of Chrysler got together, they all voted to do this, and they all said they voted voluntarily to file bankruptcy. So that's okay. Well, consider the slippery slope that that creates. Is it possible then for the government, which would be liable for taking if they did it themselves, to simply offer financial assistance to some third party and have that third party voluntarily say, yes, I'll take your money, and I will destroy these people's property, and that way the government will not be liable? I think that's what the court was trying to avoid in setting up the A&E rule. Would you mind switching to the second topic? Because as I understand it, the judgment could rest independently on the finding, if the finding were error-free, that in the absence of the challenged government action, there would have been no value, or rather, more precisely, you did not prove a positive value that the government action then took from you. Yes, certainly, Your Honor. And I think the best articulation of that test is the court's recent decision in March of this year in Anaheim Gardens, that a commercial property that is established for the purpose of providing income, that economic impact for takings purposes is measured by the change in that profitability, if you will, over time. Well, it can be. It can be, yes. Thank you, Your Honor. That is an allowable method. But that's not the basis on which the claims court rejected your evaluation testimony. She said that a proof of fair market value rather than income was necessary, but she made many other findings which would seem to defeat your valuation theory, didn't she? I would respectfully assert, Your Honor, that she did not. That is, the undisputed facts are that these dealers were profitable. They were in business. They were selling cars. They were servicing automobiles, Chrysler automobiles, on the date of taking, which was established as April 30th of 2009. They were even still doing those same things on June 9th, 2009, the day the court issued the order requiring them to close and to shutter. At that time, there were 397,600, almost 400,000, brand new Chrysler automobiles that had not yet been sold. There were 31 million Chrysler automobiles on the road that would now or later require servicing. Someone had to sell those new cars. Someone had to service those existing automobiles. Our contention is that these dealers were in business doing that. Now, maybe there were no more cars. Your theory, as I understand it, is that there would have been a Chapter 7 liquidation, but that it would have been an orderly liquidation, which would have allowed these dealers to continue to engage in business for some period of time, and that you could calculate the value of the franchises by using that income screen, right? Yes, Your Honor. With this exception, I think the Chapter 7 liquidation is sort of independent of the dealer's income stream. The dealer's income stream resulted from the sale of cars that they had already purchased. Remember that a dealer purchases the automobiles that are in the Chrysler brand, and they owned the intellectual property to be able to sell cars as certified used cars under the Chrysler brand. All of that would have continued. But the property here is the franchise agreement. She found that in a but-for world, that there would have been a Chapter 7 liquidation and an immediate rejection of the franchises. Under that finding, how would it be that the franchise agreements had value? That finding is legally incorrect, Your Honor. A rejection occurs under 11 U.S.C. 363, as it did in the real world here. That is, there can be a rejection of contracts only if there is a sale of assets. That is, it is linked to the sale of the assets. So when Chrysler sold its assets to the new Fiat Chrysler Corporation, it was able to reject contracts and accept others under Section 363. In a Chapter 7, there is no sale of the assets, in a sense, and thus no rejection of contracts. So that was absolutely wrong under bankruptcy law. I'll reserve the rest of my time if the Court has no further questions. Okay. Hearing none, thank you. We'll hear from Ms. Hossford. May it please the Court. Overwhelming evidence of record supports the trial court's conclusion that the government did not coerce Chrysler to reject 789 of its 3,000 dealer franchise agreements in bankruptcy. This case should end there. But if it doesn't, the Court also held in A&E that coercion is a necessary but not sufficient feature to establish takings liability. The dealers needed to show that their franchise agreements would have had value but for government action. Again, the evidence is overwhelming that if Chrysler had not received government assistance, it would have immediately shut down liquidation of bankruptcy and rejected all 3,000 of its dealer franchise agreements. Can you address the very last point, Mr. Marzullo? Yes. Mr. Marzullo is wrong that companies are allowed to reject executory contracts in Chapter 7. Section 365 of the Bankruptcy Code allows rejection. I think Mr. Marzullo was talking about 363. So he's just wrong about that as a matter of law. And I don't think there's any ultimate dispute about that as a matter of law. I'm sorry. Can you explain at some fairly concrete level, when the contracts were rejected, what happened to, what concrete changes did that bring about with respect to the dealers here? Is the word shutter correct? If you're talking about the dealers... Shutter with T's, not with D's. Okay. The word shutter would not apply to dealers because the dealers, the dealership encompasses a lot more than the franchise agreements that were rejected. All of these dealers kept their physical plants. Many of them were selling other cars like Toyota or Ford. Could they sell all of the Chrysler brand vehicles that were on their lots and to which they had title? Yes. Once the franchise agreements were rejected, they could still sell the cars, but they would be more like used cars rather than new cars. But that's ultimately irrelevant. The sequence of events here is that Chrysler filed for bankruptcy on April 30th. Between that time and June 9th, when the franchise agreements were ultimately rejected, the dealers still were Chrysler dealers. They were allowed to do warranty work and they were allowed to sell the cars as Chrysler dealers. It wasn't until they were rejected in June that their franchise agreements were terminated. I'm not understanding the relevance of that. We're talking about value in the hypothetical world where there was a Chapter 7 liquidation, a rejection of the agreements. Well, Mr. Marzullo was trying to imply that somehow these dealers could still have made money in a but-for-world that didn't include financial assistance from the government. The answer to that is a definitive no, because as our expert, Mr. McKenzie, testified, the trustee in bankruptcy, because of the $3.75 billion in warranty liabilities, would have immediately called for a rejection of all 3,000 of the franchise agreements. So in a but-for-world, those franchise agreements had zero value. And the claims court found that testimony credible, right? Yes, she did find that credible, but that wasn't the only evidence. There was documentary evidence, both in connection with the bridge loan made in December of 2008 and the viability plan that was submitted in February of 2009, that Chrysler recognized that if it liquidated in bankruptcy under Chapter 7, all of its dealerships would be closed. And Mr. Nardelli, the CEO of Chrysler, also testified that if they had, in a Chapter 7 bankruptcy, all the dealerships would be gone. It would be lights out. That's the term he used. So there was no dispute at trial about whether or not, there was no dispute among fact witnesses or documents about whether or not plaintiffs would have had any value in a but-for-world. The only testimony that plaintiffs put on was their experts. And Judge Firestone reviewed all of the 12 experts, reviewed all the fact testimony, reviewed the 542 exhibits that were submitted, and she decided, based on this overwhelming evidence, that plaintiffs did not meet their burden of showing that they would have had economic value in a but-for-world. There's just no question about it. But we don't even need to get there if the court finds that there was no coercion here, and there most definitely was not. Mr. Marzullo suggested that somehow the December 2008 bridge loan agreement required plaintiffs to reject dealers. That is not true. That agreement called for rationalization of the dealership network, which could be a reduction by any means. And the only reason that provision was in there was because when Chrysler went to the government in 2008 seeking that bridge loan, they said they needed to reduce their dealership network. I would also point out that plaintiffs conceded a closing argument that that bridge loan was not coerced. They entered into that loan voluntarily. So it's argumentative. If plaintiffs are right and they were coerced that that required them to reject dealers, which they're not, they voluntarily agreed to do that. They conceded that. But even setting that aside, after plaintiffs obtained their $4 billion bridge loan, which required them to establish that they would be viable and able to pay the loan, they submitted their viability plan in February 2009. In that plan, they said that... Can I just be clear? When you keep saying they, you don't actually mean the plaintiffs. You mean Detroit Chrysler? I mean Chrysler. I apologize for that. It makes rather a big difference, doesn't it? I'm sorry. Chrysler submitted its viability plan. And in the first meeting after submitting that and said that they had too many dealers and that it was bad for their brand. Then in April 2009, a month prior to Chrysler's bankruptcy, Chrysler sent the government a presentation stating that bankruptcy offered Chrysler an opportunity to reject hundreds of unwanted dealers. That's in Appendix 15A17. Now... Can I just... This is a little bit of a detour, but it would help me. Did you understand as an economic matter why Detroit Chrysler thought it would be better off if it had a shrunken dealer network? Well, as Mr. Marzullo made reference to, for years, Chrysler had been experiencing financial difficulties. And one of the things they thought that would help them deal with those financial difficulties would be to go to more a Toyota approach to selling cars where you have all of your brands under one roof. And before they realized that, they had one Dodge dealer in one part of town and one Jeep dealer in the other part of town. So they wanted to put them all under a roof. Maybe let me just ask one more question in the long run. Help me understand as an economic matter why Detroit Chrysler would think that putting them under one roof was a helpful thing. Because then there's only... For one thing, there's more costs involved with having multiple dealerships. I'm sorry, but don't the dealers bear those costs? Not Chrysler? Not Detroit Chrysler? Right. But the dealers are the ones who are establishing the goodwill and the image of the company. And they had nicer facilities. They could have bigger facilities and better brands if they were all under one roof. Okay. And that was what Project Genesis was all about. And Project Genesis preceded the financial crisis by at least a year. This is not something that came about just as a matter because of the financial crisis. This is a long-standing plan by Chrysler. And then... Can I understand what your position is? Are you saying that maybe the evidence showed that the government coerced them to go into bankruptcy, but that they didn't coerce them to reject the franchise agreements? No. The evidence showed that the government neither coerced Chrysler to go into bankruptcy or coerced them to reject the franchise agreements. I mean, the evidence was overwhelming that the government worked with Chrysler to try to find a way to achieve viability. That was its goal. And there was testimony from Mr. Ratner that at one point, the government even thought there was a chance that Chrysler could restructure outside bankruptcy if its first lien lenders who had a secured loan of $6.9 billion would agree to just take $2 billion without Chrysler going into bankruptcy. The problem with that was that the secured lien holders did not want to do that. And in fact, there's a document in the record where Mr. Nardelli writes to the dealers on April 30, 2009, and says, the reason we are declaring bankruptcy is because we were not able to settle or get concessions from our secured lenders. So it was all at the appendix 15862. So it was Chrysler's decision to declare bankruptcy and Chrysler's board that decided that bankruptcy in its best business judgment was the best way to go. So that's the answer to that question, Your Honor. Mr. Marzullo claimed that Mr. Ratner acknowledged that the government wanted Chrysler to reject franchise agreements in bankruptcy, and that was all part of the government's plan. But that's not true. As Mr. Ratner testified at appendix 21895, he said that the government believed that dealership rationalization was necessary because Chrysler proposed it. It was only evidence of the government, because this is, I'm quoting him, because Chrysler told us that part of becoming viable needed to include rationalizing the dealer network. And Mr. Bloom, who was the head of the Chrysler team when the auto team came about, also testified that although the government supported Chrysler's decision, we did not direct Chrysler to reject dealership contracts in bankruptcy, nor did we insist or require them to do so. In fact, when the government issued its written decision on the viability plan that Chrysler had submitted in February of 2009, dealership reductions weren't even mentioned in that rejection of the viability plan. So it was not like the government came into this whole process and said, wow, we don't like Chrysler's dealers. We want them to get rid of them. We're going to offer them money and force them into bankruptcy so that we can do this. That was never, ever part of the plan. The whole objective of the auto team was to ensure that Chrysler as a company would be viable if government were to invest in it and to also sort of ensure that the government would get at least some part of its money repaid. So to the extent that the dealers claim that somehow the government had this nefarious plan to get rid of dealerships, that's dealers. It's just not true. And Judge Firestone was convinced of that. I mean, she wrote a 180-page opinion detailing all of the testimony, all of the evidence that supported that. There was some discussion during the dealers' part of the argument about what the standards should be, and there's no question that Judge Firestone applied the correct standard. She quoted from the A&D decision. She set out the five factors that the court identified in the A&D decision, and she had to make a decision as to whether or not the government coerced Chrysler into going into bankruptcy and rejecting dealership agreements. There's just no question about that. I mean, Mr. Marzullo said it was a mistake for her to say forced, but forced is the equivalent of coerced. And there's also no question that the court applied the factors that this court identified. And then just getting back briefly to the economic loss, the Anaheim Gardens case is irrelevant given that the court found that Chrysler would have rejected all the dealers absent the government's assistance in this case. That evidence came through loud and clear, and she didn't even need to get to the Anaheim Gardens issue. So unless the court has other questions, we would ask that you refer in the decision below. Okay, hearing no further questions, thank you, Ms. Hossford. Mr. Marzullo? Yes, I'll be quite brief, Your Honor. First, I think in answer to Judge Toronto's question, there's no doubt that the court order that issued did shutter the terminated dealers. That court order required immediately, today, that they cease doing business as Chrysler dealers, take down their signs, they could no longer sell used cars, new cars as a Chrysler dealer, used cars as a certified Chrysler dealer, they could no longer perform certified Chrysler service. That ability, the intellectual property attaching to that brand had significant value. As to the economic impact, as of any date you pick, be it the date Chrysler filed bankruptcy, the date the court order issued, these dealers were in business. And in fact, those dealers who are not terminated, continued in business. So far from an absolute shutdown, as contended by the trial court and by the government, on the date of filing a bankruptcy, business could have continued with the on-hand new cars, used cars, and servicing capability. If the court has no further questions, thank you. Okay, hearing none, thank Mr. Mozilla and Ms. Hosford. The case is submitted. And that concludes our session for this morning. The honorable court is adjourned until tomorrow morning at 10am.